Good morning, Your Honors. I am David Nickerson. I represent Daniel Hertog, who is the claimant in this forfeiture case. Nickerson? I suspect the Court has a lot of questions in this case, because this is somewhat of an unusual case. So I am going to try to be brief in my comments. I am going to start with the jurisdictional issue, because I think that is the simplest and cleanest, and that there is no question in my mind that you are going to have to remand this to have the district court find out whether it has jurisdiction. The reason for that is because the district court applied the wrong standard in determining its jurisdiction, as even the government concedes. And the proper standard is the court has to find out under 28 U.S.C. 1355 whether or not any acts which gave rise to the forfeiture occurred in this district, this district being the Northern District of California. Well, don't we know something about that? Weren't there, indeed, acts which occurred? Carmel, for example, mail to Monterey, other events? Well, first answer to that is you are not a court who can make findings of fact. That's the district court's job. The district court has to determine whether it has jurisdiction before this court has jurisdiction. So that's the district court's job. The second answer to that is no. Those, if you want to call them facts, are basically triple hearsay out of some DEA reports about conversations that a group of guys had about things that were going to happen in the future for which there's no proof that they ever happened. So as a matter of fact … Well, that's a bit of an overstatement, isn't it? I don't think so, because all this comes from Seth Wilking. First of all, the cases underlying the statute make clear that hearsay may be relied upon if it's reliable. Right. Okay? All right. Now, what they had in front of them was the statement that had been given by this guy Bookie. Right. And then Bookie, in the statement, said that he met with your client in Carmel, wasn't it? Right. And that they discussed importing two large shipments of marijuana, one to Hawaii, one to the East Coast, right? That's correct. And in fact, going all the way to the end of the line, your client was convicted and sentenced to, what, 15 years in prison for his involvement in the Hawaii part of that, right? Correct. Okay. And later, there was some cash believed to be related to the second shipment was discovered in where? Las Vegas? Reno. Reno. Okay. Can we stop there? Go right ahead. Conversations were, before anything happened, they were discussing what outlawed was doing. That's what conspiracies are usually about, aren't they? Well, let me finish. They were talking about – Bookie wasn't part of this group. He was just a fellow smuggler, if you want to call him that. They were telling fish stories. And Bookie said that in his deposition. He said – he stopped in his deposition and said, you have to remember that these guys all exaggerate. They're fish stories. The 12-inch fish becomes an 18-inch fish. Oh, well, I remember the time I imported 42 tons. It's an exaggeration. That's what Bookie said in his testimony. First of all, these conversations that you're referring to are not testimony. They're a DEA agent's report, which was made three weeks after his conversations with Bookie. So they're not even Bookie's own statements. They're some DEA agent's recollections of conversations with Bookie. The third – the second problem is, as I said there before the fact, there's no proof that the 42-ton load ever came in. There's a lot of conversation about it, but where's the proof that it ever came in? The third step is, even if the 42-ton load came in, that has nothing to do with the money that we're talking about. There is no direct connection between this group of money and that 42-ton load and the DEA agent testified that he's not aware of any direct connection. They don't know. They can't prove it. So even if these conversations took place, which I doubt, and they're triple hearsay, they don't prove the 42-ton load came in and they don't prove that the money at issue here is any connection with the 42-ton load. That's why this standard is very important. The acts that gave rise to the forfeiture took place in this district. What little information we have is the 42-ton load, if it ever came in, and it didn't even come into Northern California. It came into Alaska. So that's why I started by saying this Court is not in a position to make findings of facts. That should have been part of a hearing in the district court where all of this stuff could have been explored. None of the parties recognized this as the standard. So there was no information that was developed about it. There was no testimony taken about it. There was no depositions taken about it, because nobody knew that that was the question. That's why my position is you have to remand this back to the district court and have that question asked. Ginsburg-Miller So are you disputing that Hartog actually lived in Carmel, that Hartog had a residence in Carmel? Wessler No. He definitely had a residence in Carmel. Ginsburg-Miller And Bookie visited him there? Wessler I do not know if Bookie visited him there. That is just hearsay and a DEA report. Ginsburg-Miller And they met in San Francisco and had all these conversations. Wessler The point is, they took Seth Bookie's deposition. They had actual testimony from Seth Bookie in Hawaii, and he never discussed these meetings. And the testimony on their depositions. Now, they could go back and take his deposition again and ask him specifically about these meetings, and he would be subject to cross-examination. Kennedy Your client declined to be deposed, correct? Wessler I believe that's true. Kennedy And what do we make of that? Wessler I don't actually know. Kennedy Do we know on what basis he refused? Wessler The reason I hesitate is I don't know when the issue of his deposition arose. If you go back through the records, and this gets into the unreasonable delay aspect, the government had him under investigation. They said the reason we needed that extra five years to we didn't file the forfeiture complaint for five years is because we were actively investigating Mr. Hartog for criminal offenses. At no point have they ever said to him even today, you're no longer under investigation. We're no longer going to charge you with any crimes. I wasn't there. I wasn't his lawyer in the district court. But as long as that's out there, I think he has a Fifth Amendment right not to testify. Kennedy If in fact, this is a civil proceeding, if in fact he refused to testify based on a Fifth Amendment privilege, can't that be construed against him in a civil proceeding? Wessler I think that that's true. But again, I don't know. I wasn't the lawyer. I don't know how that came about. I honestly don't on this record. Okay. I want to shift to unreasonable delay for a bit, because I think it's another fairly straightforward issue. The government seized the money back in 1993, in August of 1993. Roberts You have a five-year passage of time. Wessler Five-year passage of time, during which Mr. Hartog had no idea his money had been seized. He's sitting in a Federal prison. They wait five years. They file the forfeiture complaint. Kennedy Well, if he didn't know the money had been seized, how was he prejudiced? Wessler Oh, he was certainly prejudiced, because during that five-year period, they destroyed all his financial records. And then when they finally filed the complaint, they come to him and say, well, how do you prove that this money is legitimate money? His response is, you destroyed all my financial records. How can I possibly prove that now? He told them, in response to his forfeiture complaint, he said, this money came from my father. He didn't make that up, because Mr. Carboneau, who was interviewed by the government way back in, I think it was 1989 or 1990, told the government, oh, Mr. Hartog told me this money came from his father. So the government knew that all along. The government knew that Hartog was his position was, this money came from my father. They seized all of Hartog's financial records, and we have a list of what he believes was seized. They filed a forfeiture complaint, and then they destroyed his financial records. The financial records included the last will and testament of Richard Hartog, his father, business plans and records, billing records, accounting records, legal correspondence, insurance records, bank records and statements, birth certificates. That's what they destroyed. Now, how can the government say, you weren't prejudiced? Well, the whole basis for him proving that the money is his and legitimate was destroyed when they destroyed the financial records. That's his prejudice from the five-year delay. Didn't the government offer to recreate those records? No. The government went to Mr. Hartog and said, give us a description of these records, and maybe we can go out to third parties and try to reconstruct them. He gave them the best description he could. The records were seized in 87. They were destroyed in 94. This issue didn't come up until 1998. So the government put Mr. Hartog in the position of 11 years later asking him to describe the records he hadn't seen in 11 years. I don't know about your life, but I couldn't tell you what my business records were like 11 years ago. The records were seized from his home. Correct. Pursuant to search warrant. Correct. As part of the investigation which led to his indictment and conviction, right? In Hawaii, yes. Yeah. Once the conviction ñ there came a time when the conviction was final? I believe so, yeah. Did he ask for the property back? Three times. While it still existed? He had ñ I can't ñ I don't recall exactly when, but I believe there's ñ and it's in my reply brief. Three times his lawyers asked for those records back. Well, there's a formal way to do that, isn't there? I guess you could make a Rule 41 motion, yes. Yeah. You can file a Rule 41 motion in district court and say the proceeding is over, the material involved is not contraband, I'm the owner, return it to me. I suppose he could have. But what Mr. Hartog knew was those records are of his father's estate. They had nothing to do with the case in Hawaii. He didn't need those records to litigate the case in Hawaii. They were irrelevant to the Hawaiian case. Well, my point simply is there was a formal procedure by which his lawyers could have asked for those documents back. Absolutely. And if they had known, if Mr. Hartog had known the government had seized his money, he would have asked for them back. He had no reason to ask for those records back. He didn't know his money had been seized. He didn't think those records were meaningless, meaningful in any way. When did he first ask for the return of the money? When he got the forfeiture complaint. He filed, within a week, he filed a claim. That was his first notice in August of 1998 that the money had been seized. And within seven days, he filed a claim, saying that's my money, I want it back. Why are you taking my money? That's the first knowledge he had that the money had been seized, which is, as you just said, five years after they seized the money. And under the standard, the government has to give a justification for why they waited for five years. The government's never given a justification. They have no excuse for waiting five years. I suspect the real excuse is they were hoping to come up with some more evidence, but they never did. I want to briefly talk about the summary judgment issue, because I also think that that one is pretty straightforward. The magistrate judge in the district court relied entirely upon a case called United States v. $42,500. And which you have to contrast with another case called One Parcel of Real Property. What this court said in One Parcel of Real Property is if the claimant has an explanation that, regardless of whether you believe it or not, if a jury could find, could grant him relief upon that explanation, he gets a right to a jury trial. You can't just simply disregard his testimony, his deposition testimony or whatever, and say, I just don't believe it, therefore, I'm granting summary judgment. That's not the way it works in forfeiture. He has a right to his jury trial. What the district court judge here just said is, I don't believe Mr. Hartog. No real basis for him saying that. He just said, I don't believe him, and therefore, I'm granting summary judgment. Mr. Hartog had a credible claim, which was corroborated by the lawyer from Wichita, Kansas, who came forward and said, yes, the father had a cash business, he distrusted banks, he left money everywhere, he secreted it, and it's perfectly reasonable when Mr. Hartog's father died for the son to go and get that cash. And that was Mr. Hartog's explanation. And it was substantiated, corroborated by the lawyer from Wichita. I thought the lawyer said that he really didn't know how much money was involved. Exactly. This was a trust and estates lawyer? I honestly don't know what kind of lawyer he was. But he did ---- But he talked about the father's will and that sort of thing? Yes. You're exactly right. And actually, Mr. Hartog said the same thing. I didn't know how much money my father had. He would put it in bank ---- in safety deposit boxes at different banks. He would put it under the floorboards of the bar. Nobody knew how much money Mr. Hartog's father had, including the lawyer. And that's what the lawyer said, and that's what Mr. Hartog said. In fact, I think Mr. Hartog had to go to Kansas and tear up the club to look for the money. I think it was found under the floor, if I don't ---- if I recall correctly. What form did your client's description of his claim take? Was it an affidavit? Did he testify? What was it? He filed an answer to the thing, to the complaint. And there were several depositions taken, and I believe it was developed in that form. I don't recall exactly. I know that in response to the government's motion for summary judgment, they filed a counter motion for summary judgment in which they attached numerous exhibits, which included depositions, reports, and that sort of thing. And that was where they articulated their position most clearly. How much did the lawyer from Kansas say the father's estate was worth? As probated, he said I think it was about $499,000, $500,000. But then he said, I'm sure this is not all of it. I'm sure there's more money out there that I don't know about. He said, it is my recollection that we declared an estate of about $300,000, which seems on the low side of what it was worth. Correct. It was on the low side. He believed there was more out there. I think if you read that entire declaration, he says something to the effect of this $300,000 underrepresents what I believe is out there. Does that meet the precise and detailed requirement? It certainly is detailed in the sense that Mr. Hartog explained exactly how much location. There was a bank account in Canada that had $700,000 in the safe deposit box. There was $300,000 under the club that he got. It's certainly detailed, and it's corroborated by the lawyer, which is a far cry from the $42,500 case, which is some woman who got on a plane. Somebody handed her a bag of cash before she got on a plane. She didn't know who he was. The guy just told her, here, take this bag of cash to San Diego. When you get off the plane, a guy named Jose will take it from you. She didn't know whose cash it was. She didn't know where it was coming from. She didn't know where it was going. This is not that case at all. Mr. Hartog gave very detailed information about where the money came from, and that information was corroborated by the lawyer from Wichita. It's not speculation. The lawyer from Wichita didn't have any documents, any records? I don't know the answer to that, Your Honor. If he declared an estate, do you think he would have copies of what he filed? I would think he would, but I don't know. I did not litigate this in the district court. I don't know what is existing. We're talking about 20 years ago. So what is existing and what is not existing, I don't know. Anything further? No, thank you. You may reserve the remaining of your time. We'll hear from the government. Good morning, Your Honors. I'm Stephanie Hines, Assistant United States Attorney, and I'll be representing the government in this action. Hines? I will start with the place where Mr. Nickerson left off. I will start with the summary judgment motion, and in particular on the aspect of what the level of proof was that Mr. Hartog had to meet in order to rebut the government's evidence by his standard was, by preponderance of the evidence, he had to rebut that the property was forfeitable. He did not do so. As the Court has with its questions with Mr. Nickerson, Mr. Hartog's declaration that was submitted in opposition to the motion for summary judgment was unreliable. It was inconsistent. It contradicted other evidence in the case, and it was very vague with respect to details about where these assets came from. With respect to Mr. Hartog's claim to these funds, it is a claim that evolved over time. Initially, he did file a verified claim in connection with the forfeiture proceeding. In that claim, he did indicate that he owned a portion of the funds. Then he actually was deposed in connection with the civil forfeiture action. He, at the time of his deposition, refused to actually answer questions about where the source of the funds came from. He was directed by his counsel not to answer those questions. So he did not provide any information with respect to that. Hiding behind the Fifth Amendment, he did not provide that information. Asserting the Fifth Amendment. Asserting the Fifth Amendment. He has a perfect right to do that. He absolutely has a right to do that, Your Honor. But as you indicated before, Your Honor, in a civil proceeding, that assertion of the Fifth Amendment can be used to take a negative inference with respect to the source of those funds. I think it's just important as lawyers and officers of the Court that we respect that privilege and not talk like television reporters and suggest that people are hiding behind a constitutionally guaranteed freedom. My apologies, Your Honor. With respect to Mr. Artog, was also the subject the government served interrogatories on him on two different occasions with respect to the source of the funds. And, again, his claim changed at one point in time. He indicated that these funds did come from his father's estate. And that's where the money came from in the Cayman accounts. But as noted with respect to what Justice Wardlow indicated, the records from his father's probate indicated there was much less money that would have been available to and distributed to Mr. Artog at the time that these monies were deposited in the Swiss account. The his father's estate was probated in 1986, I believe. There was a distribution in 1987. At that time, Mr. Artog would have been funds of approximately $60,000 would have been available to Mr. Artog. Help me with something. In a hypothetical forfeiture proceeding, a claimant comes in, and let's say there's a million dollars in an account, and says that all or some of that account is my property and it came from legitimate sources. And he, this individual, puts forth a credible claim that 500,000 of it is, in fact, his and that, in fact, came from legitimate sources. Would the result of that proceeding, this hypothetical proceeding, be that he got that 500,000? You're saying that he put forth documentary evidence to support that additional stuff? Yeah. Let's just say for, he says, you know, I don't know how all of that money got in there, but I think half of it is mine. Here's my proof, and it came from legitimate sources, and I'll answer any question you have. And would the result of that proceeding normally be that that half would come to him? It depends on what the theory of forfeiture is, which is his past. In this case, the government theory of forfeiture was not only that it was traceable or connected to drug activity, that it was drug proceeds, but that it was money involved in money-laundering transactions. And the evidence that we have related to that is the manner in which he hands it down. I understand that. What I'm getting at is, this is a civil proceeding. Correct. So Rule 56 applies. Correct, Your Honor. And are there different summary judgment rules in a summary, in a forfeiture case than in a normal garden-variety civil case? Absolutely, Your Honor. With respect to the civil forfeiture statutes and summary judgment procedure that was in place at the time of this action, that is the – in terms of the government had to come forward with probable cause to determine that the property was forfeitable on whatever theory it was going to forfeit the property, in this case, both on a drug proceeds theory and on a money-laundering theory. Then the claimant has the opportunity to come back with reliable evidence, evidence that a reasonable fact-finder can rely on to proponents of the evidence to support or rebut the claim of forfeiture or to legitimize the amount of the funds. So the normal rule that the party opposing a motion for summary judgment who produces information which establishes a material question of fact is entitled to defeat the motion, those rules don't apply here? They are entitled to defeat the forfeitability of it. The government then has an opportunity to come back with evidence to the level of a proponent of the evidence to, again, make their case. And in a normal summary judgment procedure, when one side raises a question of fact which appears to be material, the judge is not entitled to make the ultimate fact-finder's judgment about that fact, is the judge? The judge here was the case's ---- I'm not talking about here. In a normal summary judgment procedure, one party moves for summary judgment. The other party raises a fact. It appears to be material and in conflict with a fact that the movement is relying upon. Ordinarily, the judge is not entitled to say, well, I've looked at both of those and I think A is more believable than B. That's not part of the package under Rule 56, is it? It's not, but that is also not what happens here. The Court did not look and say, I believe he wasn't making a credibility finding with respect to Mr. Harkin. It said it didn't believe him. No. What he said was the evidence was not reliable. And the courts, both in the one parcel case that Mr. Nickerson cited and in the 42500 case which the Court relied on, that was one exactly of those issues. It was whether or not that evidence is reliable such that a reasonable trier of fact could make a determination as to whether or not it rose to the level of preponderance of the evidence. It was not a credibility finding by the Court made in this regard. The Court looked at the quality of the evidence that Mr. Hartog provided, how inconsistent it was with other claims that he'd made, how the information was contradicted to a lot of the evidence that was already in the case. For example, Mr. Hartog makes the claim that these documents that were destroyed were all these financial records which he obtained from his father, which supported his claim that this money legitimately came from his father. Yet Mr. Dwyer's declaration, again, Mr. Dwyer said he didn't have much knowledge of much of the accounts or safe deposit boxes where Mr. his father kept his money. But what he did say is Mr. Hartog's father did not keep records very well. So it indicates to me and it indicated to the Court that there was not these records that Mr. Hartog claims would have saved the day and showed that all this money came from his father. Was Hartog given any notice of the government's intention to destroy the records that were seized in the search of his home? The records were not intentionally destroyed. They were inadvertently destroyed. So the answer is he was given no notice. He was given no notice, Your Honor. And it's not standard procedure for the government to destroy this kind of thing, is it? It is not, Your Honor. It was inadvertently destroyed. And those records, as the others did, were not intentionally destroyed. Do we know how it happened? Excuse me? Do we know how that happened? I don't know the particular details of how that happened, but the agency inadvertently destroyed those records in connection with the case. With respect to the question, we did, as the Court indicated, offer to try and recreate those records. We asked Mr. Hartog for, if they were real estate, tell us the property. We'll try and go to the county recorder's office and retain those records. If it was bank account information, tell us the bank, tell us your account number, whatever. We would try and locate those and that information. Additional records that he indicated that were taken in connection with the case. And the destruction occurred sometime during the 5-year period? It occurred, I think, as Mr. Nickerson said, in 1994. That's correct. So he would have any Rule 41 motion would have been unavailing? Well, he was convicted in 1992, so and as the Court indicated, the records were seized in 1987, so he could have brought a Rule 41 motion at any time up until the time that the records were brought. But no. Do we know when they were destroyed? I believe in 1994. And he was convicted in 92? That's correct, Your Honor. And they were seized in 1987. Okay. Counsel, can we get to the jurisdictional question? Do you believe that the district court applied the correct legal standard in determining jurisdiction? I think the district court was – I think the district court properly found jurisdiction. I think it could be found under either prong. The prong that I raised in my brief, which said that all that was required if we have property abroad is that actual remissions occurred in this district. As you, Justice Wardlaw, noted earlier, there were – Did the district court make those findings? He did not make findings with respect to that, although the finding – let me back up and say that. And what do we do about this? I mean, do we need to remand so that the district court could make those findings? And if we did, would he be able to do so? I don't believe we need to remand this to make those findings, because I believe there is ample evidence in the record that supports that there is jurisdiction here in this district. I believe that the district court – the statute, Title 28, Section 1355B, says that if property is abroad, the court can exercise – the district court has jurisdiction if there are actual remissions that occurred in this district or if – Well, we understand that. The problem is that there aren't express findings that these events, in fact, did occur within the district. I think in the recitation of the facts, the district court did, in fact, those same accounts, those same information that Justice Wardlow mentioned before, the $1.5 million being found to Mr. Hartog's residing here, the false identity – false identifications being mailed to Mr. Hartog's P.O. box. The planning meetings that occurred in this district – Well, those are assertions, are they not? I mean, how do we know that this is reliable evidence? This is – this is reliable evidence because the government's burden with respect to that is there is probable cause to believe that these events occurred. With respect to the state – with respect to the – But when you say he made those statements, he didn't – he made them in the – in the order granting summary judgment. He didn't make those statements or apply that law in the order denying the motion to dismiss for lack of jurisdiction. That's correct, Your Honor. But what I was trying to say is there are both – there are two different ways in which the court properly could have found jurisdiction. One is the one that I espoused in my brief, which was all he had to look to were action or omissions occurring in this district. He took the unnecessary step, but not improper, of saying that if a competent – if the foreign authorities assisted us in seizing, freezing, or detaining those funds, then that gave the court constructive custody over the – those funds. And that's exactly the prong that he went on, and the statute provides for that. So my – But don't we have the – is it the Mesa case that casts some doubt on that? The Mesa case does suggest that the court needs to have both venue and accident events occurring with respect to that. But I believe there are other cases – there are other cases that hold differently. And those cases are the Banco Espinal case, which I cited in my brief, at 295 F. 3rd, 22, D.C. Circuit Court, 2002, and the contents of accounts case at 344 F. 3rd, 399, 3rd Circuit, 2003. Those cases are in the briefs. I believe they are in the – I believe they are in the brief. And those cases support the district court's finding, I believe, that as long as the foreign authorities did, in fact, undertake efforts to enforce the order, enforce our requests. So you're suggesting there was, in fact, a finding with respect to constructive possession. Absolutely. Absolutely. Although there was not a finding with respect to these events within the district. That's correct. That is absolutely correct. The court did not – But you're saying, if I understand you correctly, that so far as the events within the district are concerned, the simple assertion by the government is enough to establish jurisdiction on a probable cause contention? Is that what – did I understand you correctly? That is my belief. I believe that the court can affirm with respect to jurisdiction on any of the facts that are in the record that support that. I believe that the court can affirm that. You see, you keep using the words facts, and the problem is we don't have a finding of fact with respect to the events within the jurisdiction. I'm having difficulty with that. If what you're saying is you don't need a finding of fact, well, then that might work, but I need to know what's the government's burden and what does the court need to have before it, before it can find under the statutory option. I believe the government's burden is similar as to what it was with respect to the summary judgment motion of probable cause indication, and I believe that is clear in the record. But I also believe that what the district court did in making a finding with respect to the constructive custody is sufficient under the statute, again, to confer jurisdiction. So I believe the record is clear that jurisdiction is proper here in the Northern District of California. Roberts. You answer a question if you can, just to clear up a loose fact. Certainly, Your Honor. This fellow in Canada, Carboneau? Yes, Your Honor. A lawyer? He was a lawyer in for – in Canada. He was not a practiced lawyer. He's a lawyer. And was the government's belief that he was involved in the money laundering? Yes, Your Honor. Did the government return some of the money in the Cayman accounts to Carboneau? Yes, Your Honor. How much? How much? I don't have the exact figure with respect to that in front of me, but it was – Take a guess. I'm going to say probably around $200,000, maybe $300,000, but that's, to be honest, a guess. This was money that the government thought was the result of either drug trafficking or money laundering? No, Your Honor. This was – Mr. Carboneau had – he actually was a financial investor as well, and he had clients of which we could not connect to any sort of drug activity who gave him money to invest in these corporations that he had set up. The money that we gave back to Mr. Carboneau was money related to these clients that were in Canada that he had invested monies on behalf of. Did he have immunity? He did get immunity to come and testify before the grand jury, Your Honor. Use or transactional? I think it was use immunity, Your Honor. Has he ever been charged? He has not been charged in the United States, no. Thank you. Sure, Your Honor. Oh, can I just ask one more question? What's the government's justification for the 5-year delay? The justification is clear. We were continuing our criminal investigation with respect to Mr. Hartog and his wife with respect to drug trafficking and money laundering activities. During that period of time, as the Court knows and may know, at least as we indicated in our brief, the government was required at the time that it filed the civil forfeiture complaint, at that point in time, the Ninth Circuit required that the government gather all evidence that it was going to use to make its case at the time that it filed its complaint. So during that period of time, the government was gathering records from these foreign banks, the Swiss bank, the Cayman authorities. We were gathering all these reports from other law enforcement agencies that participated in the whole host of all the different investigations that were going on. So that is – and we were also negotiating with Mr. Carboneau to come and testify before the grand jury. I believe he testified in December of 1998, I believe. No, December of 1996. And so there was all that period of time that the government was trying to gather all the information that it was going to need in pursuit of its civil forfeiture action. Do you agree with counsel that the client, Mr. Hartog, never knew that these assets were seized? He did not know that the assets were seized. We would not have, when we were making the AMLAT request, informed him of that, because, obviously, we were working our investigation. Now, whether he knew because Mr. Carboneau may have told him, I do not know. But the government did not inform him at the time of the seizure. You have no evidence to contradict counsel's statement. I have no evidence to contradict his statement. That's correct. Who was the U.S. attorney for the Northern District during that time period? The actual U.S. attorney? I think it was Michael Yamaguchi. Thank you, Your Honor. Thank you, counsel. Mr. Nickerson, you have a little bit of reserved time. Thank you, Your Honor. I will try to be brief. The questions about Mr. Carboneau were interesting because, since the U.S. attorney started her argument, one of the things she said was that Mr. Hartog's explanation shifted over time. Well, that's true, and there's a very good reason why his explanation shifted over time. When he first filed his answer to the complaint, he thought all the money that was at issue was his money. It wasn't. What Mr. Carboneau had done was taken Mr. Hartog's money from Canada to Switzerland and then transferred it from Switzerland to the Cayman Islands without telling Mr. Hartog, and then he commingled Mr. Hartog's money with money from his other clients, Mr. Carboneau's other clients. Mr. Hartog didn't know any of that. When he got the forfeiture complaint, it was just he thought his money was his money. As the litigation developed, it turned out, as Mr. Carboneau eventually told the government and everybody else, no, there's other clients' money mingled in this money that you seized. So then it became an issue of how do you figure out how do you separate the different monies. So when Mr. Hartog's explanation changed, it was as to the amounts of money. Oh, there's $2 million here. That's not all mine. Now Mr. Carboneau tells me that's commingled with other clients, so I'm only concerned about my money, which is this portion of this money. That's why when the government says his story changed, it did, because as the litigation proceeded and Mr. Hartog learned more about what happened to his money, his explanation changed, because he didn't know that the money had gone from Switzerland to the Caymans. He didn't know that it was commingled with other people's money. He didn't know it had been seized. He only learned this stuff over time after the forfeiture complaint was filed. Going back to the summary judgment motion, summary judgment in a forfeiture case is different. It's a completely different standard. It's very precise. You have to look at it under that standard and not the general standard. The facts that the government – let me say this about the jurisdictional argument. There are two standards. There's the Mesa standard and then there's the – I think it's the 1355 standard. The district court only addressed the Mesa standard. Nobody, even the Second Circuit, which developed the Mesa standard, follows the Mesa standard anymore. Nobody agrees that that's the wrong standard. The district court never made any factual findings, never addressed the issue of jurisdiction under the correct standard. None of the parties addressed the issue under the correct standard. That's why there are no facts. There's no findings of facts. The facts were never developed about the jurisdictional question. Roberts. I know you didn't try the case, but did the counsel who did, representing Mr. Hartog, request findings of fact and conclusions of law? Not in those words. They did file a motion for reconsideration where they argued that many of the district court's factual findings were wrong. Let me make this really clear. Nobody at the district court level understood the jurisdictional issue. Nobody addressed it. Nobody developed facts about it. Nobody made any factual findings about it. That's why, as my position, you have to remand it. If the government's going to rely upon its claim to the court to do that, it's going to be a failure. On the 1355, but there were findings, according to the U.S. attorney, with respect to the constructive possession, were there not? Yes. That's the Mesa standard. Yeah. Which is the wrong standard. Everybody addressed the wrong standard. Now, if we address the correct standard, we can go back and take depositions on the question of jurisdiction and ask people like Seth Bookie about these alleged conversations in Carmel. Because what he – Seth Bookie says in other places contradict those conversations. Seth Bookie says, I don't know whether this lawyer – Isn't he actually in the Witness Protection Program? I believe he is, but the government produced him for a deposition, so it's not that difficult to ask him these questions. Because what I was about to say is, at other points in his testimony, he's an informant. His testimony changes whenever you ask him a question. At one point, he says, I have no other – no idea whether that 22-ton load came in. I was arrested before that ever happened, and after that point, nobody was talking to me. So he doesn't know. Thank you, counsel. The case just argued will be submitted for decision, and we will hear argument in Cox v. Del Papa.
judges: O'scannlain, Hawkins, Wardlaw